NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KAZUO URATA,** | : |
| | : |
| **Plaintiff,** | :     Civil Action No. 12-5704 (JLL) |
| | : |
| **v.** | : |
| | : |
| **CANARE ELECTRIC CO. LTD.,** | : |
| **ET AL.,** | : |
| | :     **REPORT AND RECOMMENDATION** |
| **Defendants.** | : |
| | : |

**HAMMER, United States Magistrate Judge**

## I.    INTRODUCTION

This matter comes before the Court on Plaintiff's motion to remand. Mot., ECF No. 19.[1]

The Honorable Jose L. Linares, United States District Judge, referred the motion to the

undersigned for Report and Recommendation. Pursuant to Federal Rule of Civil Procedure 78, the

Court did not hold oral argument. For the reasons that follow, the Undersigned respectfully

recommends that the Court grant Plaintiff's motion to remand.

## II.    BACKGROUND

Kazuo Urata brings this action against Canare Electric Co. Ltd. ("CCE"), which is a

Japanese corporation, and Canare Corporation of America ("CCA"), which is CCE's wholly

owned American subsidiary and a New Jersey corporation. Plaintiff asserts claims for: (1) age

---

[1] The Court administratively terminated Plaintiff's first motion to remand (ECF No. 7) and ordered the parties to refile and address the United States Supreme Court's recent decision in Gunn v. Minton, – U.S. –, 133 S. Ct. 1059 (2013). Feb. 27, 2013 Order, ECF No. 18.

discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.

10:5-12 (Count One); (2) breach of a covenant of good faith and fair dealing (Count Two); and (3)

breach of contract (Count Three). Amended Compl. (attached as Exh. A to Notice of Removal,

ECF No. 1).

According to the Amended Complaint, Plaintiff served as President of CCA from July 1,

2007 to March 8, 2012. Amended Compl., Count 1, ¶ 1.[2] Plaintiff claims that beginning in

November 2011, senior management of CCE requested that Plaintiff retire from his position as

President. Id. ¶ 2. Plaintiff further alleges that senior management of CCE requested that he retire

because he was about to turn sixty years old. Id. Count 1, ¶¶ 2-3. Plaintiff claims that when he

refused to retire, CCA fired him due to his age, thereby violating the NJLAD's age-discrimination

provision. Id. Count 1, ¶ 4.

In Count Two of the Amended Complaint, Plaintiff claims that his termination constituted a

breach of the covenant of good faith and fair dealing, because "[t]here were no terms in the

contract relating to a mandatory retirement date or a term of years after which the contract would

be invalid." Id. Count 2, ¶¶1-2. Thus, Plaintiff claims that Defendants breached their duty to

perform under the employment contract in good faith. Id. Count 2, ¶¶4-5. In Count Three,

Plaintiff alleges that Defendants committed breach of contract by failing to honor their

commitment to give Plaintiff twenty percent of his salary as additional compensation for

participating in CCA's move from California to New Jersey. Id. Count 3, ¶¶1-3. All of the claims

---

[2] Defendants contend that Plaintiff signed the employment contract with CCE in
September 2005. Def. Opp., ECF No. 21, at 6. The employment contract submitted by
Defendants is dated September 16, 2005. Certification of Kimberly A. Capadona ("Capadona
Certif."), Exh. B, ECF No. 22-2.

are based on state law.

Defendants claim their employment agreement with Plaintiff and Japanese law allowed them to fire Urata if he refused to resign. Def. Opp., ECF No. 21, at 6-7. Defendants claim that Plaintiff's employment contract with CCE incorporated CCE's employment handbook, which in turn provided that Plaintiff agreed that his retirement date "would be the end of the month in which his sixtieth birthday occurred." Certification of Kimberley A. Capadona, April 1, 2013 ("Capadona Certif."), Exh. C, ECF No. 22-3. Further, Defendants assert that Plaintiff's employment contract mandated acceptance of CCE's policies, and that Plaintiff signed an oath to CCE agreeing to follow CCE's employment practices. Def. Opp. at 6 & Capadona Certif. Exh. D, ECF No. 22-4. CCE argues that the Treaty of Friendship, Commerce and Navigation Between the United States and Japan, 4 U.S.T. 2063 (April 2, 1953) ("FCN Treaty") permits this practice.

Defendants further assert that CCE assigned Plaintiff in September 2005 to serve as President and Chief Executive Officer of CCA in California. Capadona Certif. Exh. E, ECF No. 22-5. On or about December 26, 2008, Canare Corporation of America, a California Corporation, merged with Canare Corporation of America, a New Jersey corporation. Capadona Certif., Exh. G, ECF No. 22-7. The resulting corporation was Canare Corporation, a New Jersey Corporation. Id. at page 2, ¶ 1. Canare Corporation of America, a California corporation, ceased to exist. Id. ¶¶ 1-3. The agreement named Plaintiff as the President of CCA in New Jersey. Id. ¶ 7. Plaintiff also signed the merger agreement on behalf of both CCA-California and CCA-New Jersey, and was listed as both President and Treasurer of CCA-New Jersey. Id.; see also id. at page 4.

According to Defendants, on March 7, 2012, a CCE official met with Plaintiff and presented him with a notification of appointment that terminated his transfer to CCA, effective

April 26, 2012, and reassigned him to CCE's administrative department in Japan.  Id. Exh. H, ECF No. 22-8 (March 7, 2012, letter from CCE President and Representative Director Masao Owase to Plaintiff stating "[y]our assignment, the temporary transfer to CCA, will end on April 26, 2012 and you will return to Canare Electric Co. Ltd. on this date.  Your new position is in the Administrative Department.").  When Plaintiff refused the assignment in Japan, Defendant Canare Electric Co. terminated Plaintiff's employment.  Def. Opp. at 7.

On May 2, 2012, Plaintiff filed this action in the Superior Court of New Jersey, Passaic County.  Mot. to Remand, ECF No. 19-1, at 3.  After some issues regarding the proper names of the parties, and two corresponding amendments of the complaint, Defendants were served with process on August 15, 2012.  Id.; Notice of Removal, ECF No. 1, ¶ 2.

On September 12, 2012, Defendants filed their notice of removal.  Defendants asserted that this Court possesses subject matter jurisdiction because this case raises a federal question pursuant to 28 U.S.C. § 1331.  Specifically, Defendants argue that adjudication of Plaintiff's claims will require "substantial" interpretation of the FCN Treaty to determine whether Defendants' right to employ "executive personnel . . . of their choice" extends to recalling that employee.  Id. ¶¶ 5–6; Def. Opp., ECF No. 21, at 11-12.  On November 28, 2012, Plaintiff moved to remand the action back to the Superior Court of New Jersey.  First Mot. to Remand, ECF No. 7.  On February 27, 2013, the Court administratively terminated the motion and instructed the parties to address the recent holding of the Supreme Court in Gunn v. Minton, – U.S. –, 133 S. Ct. 1059 (2013).  Order, ECF No. 18.  On March 13, 2013, Plaintiff submitted the current motion to remand.  Second Mot. to Remand, ECF No. 19. On April 1, 2013, Defendants filed their opposition. Def. Opp., ECF No. 21.  On April 8, 2013, Plaintiff filed his reply.  Reply, ECF No. 23.

### III.   DISCUSSION

As an initial matter, the Court notes that a decision to remand is dispositive.  In re U.S. Healthcare, 159 F.3d 142, 146 (3d Cir. 1998) ("[A]n order of remand is no less dispositive than a dismissal order of a federal action for lack of subject matter jurisdiction where a parallel proceeding is pending in the state court.")  Accordingly, the Court respectfully submits the following Report and Recommendation to United States District Judge Jose L. Linares.

### A.   Plaintiff's Motion to Remand

Removal of a civil case to federal court is governed by 28 U.S.C. § 1441.  A defendant may remove an action brought originally in state court only if the plaintiff could have filed the complaint within the original jurisdiction of the federal court.  28 U.S.C. § 1441(b); see also 28 U.S.C. § 1441(a) ("Except as otherwise provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant… to the district court of the United States…").  A federal court lacking subject matter jurisdiction over a case must remand the matter back to state court.  28 U.S.C. § 1447(c); see Farina v. Nokia, Inc., 625 F.3d 97, 114 (3d Cir.  2010) (noting that federal courts can neither proceed without subject matter jurisdiction, nor can a party waive a lack of jurisdiction).  The party asserting federal jurisdiction by way of removal bears the burden of establishing that subject matter jurisdiction exists at all stages in which the case is properly before the federal court.  Samuel-Bassett v. KIA Motors Am., Inc., 357 F.3d 392, 396 (3d Cir. 2004).

Section 1441 is to be construed strictly.  All doubts must be resolved in favor of remand.  Id.  (stating that courts construe § 1441 strictly to honor "the Congressional intent to restrict federal diversity jurisdiction"); Batoff v. State Farm Ins.  Co., 977 F.2d 848, 851 (3d Cir. 1992)

("[R]emoval statutes are to be strictly construed against removal and all doubts should be resolved in favor of remand.") (internal quotations and citations omitted); <u>Abels v. State Farm Fire & Casualty Co.</u>, 770 F.2d 26, 29 (3d Cir. 1985) ("Because lack of [federal] jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile, the removal statute should be strictly construed and all doubts should be resolved in favor of remand.") (citations omitted).

Generally, courts will follow the "well-pleaded complaint rule," which holds that if the complaint raises only state law claims, it cannot be properly removed. <u>Caterpillar Inc. v. Williams</u>, 482 U.S. 386, 392 (1987). Invocation of a federally based defense is insufficient to warrant removal, so long as plaintiff's claims are confined to state law. <u>Id.</u> at 393 ("Thus, it is now settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue."); <u>Merrell Dow Pharmaceuticals, Inc. v. Thompson</u>, 478 U.S. 804, 808 (1986) ("A defense that raises a federal question is inadequate to confer federal jurisdiction."). None of Plaintiff's claims sound in federal law—they are all state law claims.

The well-pleaded complaint rule and <u>Caterpillar Inc.</u> would seem to foreclose the issue. But Defendants argue there is an exception to the general rule wherein a claim, even wholly based in state law, may still yield federal jurisdiction. Def. Opp., ECF No. 21, at 9. That exception applies if a plaintiff's state law claim necessarily depends on a substantial federal issue. <u>Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.</u>, 545 U.S. 308, 314 (2005) ("[T]he question is does a state-law claim necessarily raise a stated federal issue, actually disputed and

6

substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."). This exception is not new, but it has not been uniformly applied or articulated by federal courts. See, e.g., Gunn v. Minton, — U.S. —, 133 S. Ct. 1059, 1064-65 (2013) (comparing prior existing case law to the frenetic, abstract paintings of Jackson Pollock); Charles A. Wright, et al., 13D FED. PRAC. & PROC. JURIS. § 3562 (3d ed.) ("Indeed, it does not really have a commonly-used name, though some courts and scholars refer to it as the 'centrality' requirement. It is the requirement that the federal law injected by the plaintiff's well-pleaded complaint be sufficiently central to the dispute to support federal question jurisdiction. Put simply, centrality is concerned with 'how federal' the claim must be."). The Supreme Court recently clarified the applicability of this exception in Gunn. In Gunn, the Court held that the exception is particularly narrow and set out a four-part test to determine whether federal jurisdiction is proper despite a complaint's state-law claims.

In Gunn, the plaintiff had been involved in patent litigation wherein his attorneys failed to assert an argument for patent invalidity. Gunn, 133 S. Ct. at 1062–63. Plaintiff then brought a legal malpractice claim in Texas state court, in which the trial court granted summary judgment for the defendants. Id. at 1063. The decision required the court to interpret and apply federal patent law. On appeal, plaintiff argued, for the first time, that because a successful claim for legal malpractice would require him to prove the merits of the underlying patent claim, only the federal courts, which possess exclusive jurisdiction over patent claims, could properly adjudicate the matter. Id. The Texas Court of Appeals rejected this argument, with the majority finding the federal elements of the action insufficiently substantial, and stating that bringing a state law malpractice claim into federal court went against the balance of powers. Id. On appeal, the

Supreme Court of Texas reversed, reasoning that "the federal government and patent litigants have an interest in the uniform application of patent law by courts well-versed in the subject matter." Id. at 1063–64 (internal quotations and citations omitted). The U.S. Supreme Court granted certiorari and reversed. Id. at 1064.

The Court reiterated the well established principle that federal courts are courts of limited jurisdiction, which can only exercise powers authorized by the Constitution or federal statute. Id. Relevant in Gunn, and the case here, is 28 U.S.C. § 1331,[3] which grants jurisdiction in "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Court further stated that the phrase "arises under" typically has been used in two ways: (1) where the claim for relief is created by a federal law; and (2) as a limited exception where federal jurisdiction is proper even though the claim is based in state law. Gunn, 133 S. Ct. at 1064–65. That second application of "arises under" was the pertinent issue in Gunn, as it is here.

Recognizing that this exception should remain narrow but required clarification, the Court reversed and added clarity with a conjunctive four-factor test. Id. at 1065. This test aims to determine whether the state-law claim raises a disputed and substantial federal issue which may properly be resolved in federal court without disturbing the balance between state and federal judicial powers.[4] Id. (citing Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545

_____

[3] The Gunn Court also considered § 1338, which grants exclusive jurisdiction to federal courts over patent claims. Gunn, 133 S.Ct. at 1064. Section 1338 is not relevant to this case.

[4] The Gunn test has clarified the analysis for federal question jurisdiction where a federal claim has not been pled, from the previous tests that focused on whether the federal law completely preempted the state law, or if the plaintiff had merely pled around a necessary federal claim. See, e.g., Collins v. Baxter Healthcare Corp., 949 F.Supp. 1143 (D.N.J. 1996) (analyzing whether a plaintiff's claims for injuries were completely preempted by federal law to see whether (continued...)

U.S. 308, 314 (2005)). The Court held that: "federal jurisdiction will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by congress." Id.

In Gunn, the Court analyzed two examples of Supreme Court precedent where state-law claims did raise "substantial" federal issues. First, in Grable, the Internal Revenue Service sold property that it had seized from the plaintiff to satisfy the plaintiff's federal tax delinquency. Then, the plaintiff filed a quiet title action–a state-law claim–against the third party entity that had purchased the property. The plaintiff alleged that the sale was invalid after the IRS failed to comply with certain notice requirements that were mandated by federal statute. In holding that the case gave rise to a federal question, the Court in Grable focused on the broader significance of the notice question for the federal government as whole, and emphasized the Government's strong interest in being able to recover delinquent taxes through seizure and sale of property. "The Government's 'direct interest in the availability of a federal forum to vindicate its own administrative action' made the question an important issue of federal law that sensibly belonged in a federal court." Gunn, 133 S. Ct. at 1066 (quoting Grable & Sons, 545 U.S. at 315).

Second, the Gunn Court discussed Smith v. Kansas City Title & Trust Co., 255 U. S. 180 (1921). In Smith, the plaintiff claimed that the defendant bank could not purchase government bonds because the bonds were issued in violation of the United States Constitution. The Court "held that the case arose under federal law, because the 'decision depends upon the determination'

_____

⁴(...continued)
or not remand was proper); United Jersey Banks v. Parell, 783 F.2d 360, 366 (3d Cir. 1986) (finding federal jurisdiction proper where either; there appears a necessary and substantial dispute of federal law essential to one of the state claims, or when plaintiff's claim is really one of federal law).

of 'the constitutional validity of an act of Congress which is directly drawn in question.'" Gunn, 133 S. Ct. at 1066 (quoting Smith, 255 U.S. at 201). The Gunn Court found that "the relevant point was . . . the importance more generally of a determination that the Government securities were issued under an unconstitutional law." Id.

The plaintiffs in Grable and Smith brought state-law claims predicated on disputed and substantial federal issues. In Grable, the plaintiff's quiet-title claim could not go forward without first resolving plaintiff's allegations that the federal government had failed to comply with its own notice requirements. Grable & Sons, 545 U.S. at 315 (finding federal jurisdiction when "a state-law claim necessarily raised a federal issue"). In Smith, the plaintiff's action against a bank could not go forward without first resolving plaintiff's allegations that Congress had acted unconstitutionally. Smith, 255 U.S. at 201 ("The objecting shareholder avers in the bill that the securities were issued under an unconstitutional law, and hence of no validity."). Unlike the plaintiffs in Grable and Smith, Urata's state-law claims are not predicated on any federal issues.

Rather, it appears that Defendants intend to argue, as an affirmative defense, that their pre-existing employment agreement, allegedly valid under Japanese law and agreed to by Plaintiff, and Article VIII of the FCN Treaty, allowed Defendants to recall or dismiss Plaintiff without regard to anti-discrimination laws. See Def. Opp., ECF No. 21, at 4 ("Specifically, the question presented is whether an expatriate executive, such as plaintiff, who is dispatched by a Japanese corporation to manage its U.S. subsidiary, can assert claims in the United States based on employment decisions made pursuant to lawful agreements entered into between the expatriate executive and the Japanese parent corporation?"); Id. at 10-11 (stating that Article VIII of the FCN allows Defendants to determine their executive personnel "without being subject to potential claims by the executive

10

personnel under U.S. discrimination laws"); id. at 11 ("More specifically, this case requires the determination of whether the right of companies to a treaty signatory, such as Japan, to 'engage' executives of their choice extends to recalling such executive personnel without being subject to discrimination claims in the United States for conduct that is not unlawful in the Treaty signatory's country."). But no element of Urata's claims invokes or implicates a federal question—instead they present typical state-law claims based on New Jersey statute and common law. The applicability of the FCN Treaty is raised wholly by Defendants as a potential affirmative defense against Urata's discrimination claims. Urata alleges he was discriminated against based on his age. Defendants argue that even if that is true, they should be absolved of liability due to the employment agreement with plaintiff, which is permissible under Japanese law and the FCN Treaty. Defendants frame the issue as one where "Plaintiff's claims are deeply rooted in the FCN Treaty and require uniform interpretation of the FCN Treaty for resolution." Def. Opp., ECF No. 21, at 9. Beyond this, and other similar conclusory statements, however, Defendants have not shown how Plaintiff's claims, by themselves, require resolution of the FCN Treaty. The Court has reviewed Plaintiff's pleadings and does not find any mention or reference to the FCN Treaty; nor can it find any suggestion that the Court would have to interpret the FCN Treaty in order to determine whether Plaintiff has satisfied the elements of his discrimination claims. Rather, the FCN Treaty is at issue only if it can absolve Defendants of wrongdoing—in other words, as an affirmative defense.

Courts interpreting Gunn and Grable hold that federal jurisdiction exists only when a necessary, disputed, and substantial federal issue is an element of the plaintiff's state-law claim. Analyzing relevant Supreme Court precedent, the Seventh Circuit explained "Grable does not alter

the rule that a potential federal defense is not enough to create federal jurisdiction under §1331."

Chi. Tribune Co. v. Bd. of Trs. of the Univ. of Ill., 680 F.3d 1001, 1003 (7th Cir. 2012).   The

Seventh Circuit went on to say "[i]ndeed, Grable has nothing to do with using federal defenses to

move litigation to federal court.  In Grable the federal issue was part of the plaintiff's own claim . .

. . The Supreme Court had to decide whether a claim 'arises under' federal law for the purpose of

§1331 when one element of a claim depends on state law and another on federal law."  Id. at 1003-

04.  Numerous other courts similarly have held that post-Grable, it remains that the elements of

plaintiff's claims define whether there is federal jurisdiction, and that a potential federal defense is

insufficient to confer federal jurisdiction.  See Cambridge Literary Props., Ltd. v. W. Goebel

Porzellanfabrik G.m.b.H. & Co. Kg., 510 F.3d 77, 96 (1st Cir. 2007) ("Grable thus requires us [to

inquire whether] the Cambridge state-law complaint, on its face, and without reference to any

possible defenses, necessarily discloses an actual and substantial dispute concerning the

interpretation of the Copyright Act."); Illinois v. McGraw-Hill Co., 2013 U.S. Dist. LEXIS 63315,

at *13-14 (N.D. Ill. May 2, 2013) (finding no federal jurisdiction under Grable when "issues of

defendants' compliance with the ICFA's and the UDTPA's statutory exemptions is an affirmative

defense to liability, not something that a plaintiff must prove"); Isufi v. Prometal Constr., Inc.,

2013 U.S. Dist. LEXIS 28488 (E.D.N.Y. Feb. 28, 2013) ("A disputed and substantial question

sufficient to confer federal jurisdiction is one that is an 'essential element' of a plaintiff's claim and

requires a court to examine a contested issue of federal law in order to resolve the plaintiff's cause

of action."); Citigroup, Inc. v. Wachovia Corp., 613 F. Supp.2d 485, 495 (S.D.N.Y. 2009)

(applying Grable and finding no federal jurisdiction because no element of plaintiff's claims

"depended on a construction of federal law"); Shore Bank v. Harvard, 2013 U.S. Dist. LEXIS

32556, 27-28 (E.D. Va. Mar. 8, 2013) ("A state law claim necessarily raises a federal issue if a question of federal law 'is a necessary element of one of the well-pleaded state claims.'") (quoting Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 808 (1988)).

It is clear from the Complaint and briefing that Urata can prove all the elements of his claims without resorting to any analysis or interpretation of any federal issue. His claims sound purely in state law and do not depend on a question of federal law. As such, remand is appropriate. Nothing in either Grable or Gunn suggests that the Supreme Court intended to overturn its well established case law that an affirmative defense does not give rise to federal-question jurisdiction. See Ben. Nat'l Bank v. Anderson, 539 U.S. 1, 6 (2003) ("[A] defense that relies on the preclusive effect of a prior federal judgment . . . or the pre-emptive effect of a federal statute . . . will not provide a basis for removal.") (internal citations omitted); Rivet v. Regions Bank of La., 522 U.S. 470, 471 (1998) ("Because a defense is not part of a plaintiff's properly pleaded statement of his or her claim . . . removal of a case to federal court may not be predicated on the presence of a federal defense."); Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 14 (1983) ("[It is] settled law that a case may not be removed to federal court on the basis of a federal defense . . . . "). However, Defendants interpret the Supreme Court's language in Grable and Gunn broadly[5] and suggest that whenever any substantial federal issue requires resolution, a court can exercise federal

---

[5] Reading Grable by itself, it is unclear how broad the Court intended this exception to be. But in light of subsequent rulings, both by the Supreme Court and other Circuit Courts, the prevailing interpretation is that the Grable holding is narrow and limited to only "extremely rare" circumstances. Gunn, 133 S. Ct. at 1064; Empire HealthChoice Assur., Inc. v. McVeigh, 547 U.S. 677, 701 (2006) ("This case cannot be squeezed into the slim category Grable exemplifies."); Chi. Tribune Co., 680 F.3d at 1003 ("Some of the language in Grable could be read to say that all important federal issues should be resolved in a federal forum, but Empire Healthchoice concluded that Grable should not be so understood.").

question jurisdiction. Even if that were the case or Defendants could somehow show that interpretation of the FCN Treaty was an element of Urata's claims—premises that the Court rejects—the Court still would not have jurisdiction because the issue raised is not sufficiently substantial in light of the Supreme Court's holding in <u>Gunn</u>. For the sake of completeness, the Court will discuss all four <u>Gunn</u> factors.

### i. Whether a Federal Issue Is Necessarily Raised

Defendants argue that this case requires the Court to interpret the FCN Treaty and any such interpretation gives the Court federal question jurisdiction because it is important to have uniform application of law regarding a treaty. Specifically, Defendants point to the language in Article VIII of the FCN Treaty and assert:

> Accordingly, this Court has jurisdiction over Plaintiff's claims to determine whether the treaty rights of companies of Japan and the U.S. to 'engage . . . executive personnel . . . of their choice' pursuant to Article VIII(1) of the FCN Treaty, includes the right to recall or terminate the Plaintiff expatriate executive in accordance with the terms of his employment agreement and the policies of his employer, who dispatched him overseas.

Def. Opp., ECF No. 21, at 4. Defendants argue that this is an issue of first impression and will have far ranging effect on how corporate businesses conduct operations in the United States. Plaintiff argues that the FCN Treaty does not apply. Plaintiff further argues that even if the FCN Treaty applied somehow, courts have extensively interpreted it and others like it, and this case presents no novel issues of interpretation or application.

The Court notes that the language of the FCN Treaty addresses only companies engaging (*i.e.* hiring) executives of their choice and does not discuss terminating executives. Nevertheless, because Plaintiff does not dispute that this case necessarily raises a federal question, the Court will assume this factor has been met for purposes of this analysis.

14

### ii. Whether the Federal Issue Is Actually Disputed

It appears that Defendants intend to rely on the FCN Treaty to argue that they could terminate plaintiff's employment consistent with the employment agreement and without regard to New Jersey law. Plaintiff argues that the FCN Treaty does not apply here. It is clear there is an actual dispute over the interpretation of the FCN treaty, and thus, the Court finds the second factor is satisfied. Moreover, Plaintiff again concedes that this prong is met. See Mot. at 5, ECF No. 19-1.

### iii. Whether the Federal Issue Is Substantial

Plaintiff contests the final two prongs of the Gunn test. Therefore, the Court now turns to the third prong to determine whether interpretation of the FCN Treaty raises a substantial federal issue. In Gunn, the Supreme Court explained that one cannot answer this question by considering the issue's significance to the parties, as any necessarily raised and disputed issue, federal or state, will always be important to the individual case. Gunn, 133 S. Ct. at 1066. Rather, substantiality hinges upon "the importance of the issue to the federal system as a whole." Id. In Gunn, the Court held that a question of patent law underlying a legal malpractice claim was not substantial. That holding was premised on several considerations. First, the issue would not have far-reaching effects on patent law or the federal system in general. Id. at 1066–68. Despite the federal interest in the development of a uniform body of patent law, most questions of patent law would continue to be decided by the federal judiciary and state court rulings on patent issues would not bind the federal courts. Id. Second, any state court would be guided by existing federal precedent where the issues already had been litigated, and federal courts would not be bound by state courts on substantive patent-law issues. Id. at 1066–67. Finally, the Court observed that even if a case

15

presented a novel federal issue, it would likely either (1) be rarely litigated and have little effect, or (2) soon be decided by a federal court and any contrary state precedent would be overruled.  Id. at 1067 ("If [a novel] question arises frequently, it will soon be resolved within the federal system, laying to rest any contrary state court precedent; if it does not arise frequently, it is unlikely to implicate substantial federal interests.").  Ultimately, the Court found that the facts before it were "poles apart from Grable, in which a state court's resolution of the federal question would be controlling in numerous other cases."  Id.

Defendants argue that the federal interests here are substantial because interpretation of the FCN Treaty "will reach beyond the interests of the current litigants and affect the rights of other companies of the signatories to similar FCN treaties."  Def. Opp., ECF No. 21, at 14.  The Court is not convinced.  "[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." Merrell Dow Pharmaceuticals, Inc. v. Thompson, 478 U.S. 804, 813 (1986).

Another federal court rejected a similar argument.  In Haith v. Bronfman, plaintiffs filed a shareholder derivative suit based on state law.  Defendants argued that federal jurisdiction under Grable existed because plaintiffs' claim required determination of a number of federal statutes and regulations, and any interpretation of federal law by a state law court could have ramifications on how those laws were enforced.  Haith v. Bronfman, 2013 U.S. Dist. LEXIS 28042, at *13-16 (N.D. Ill. Mar. 1, 2013).  The court disagreed, stating in pertinent part as follows:.

> As Gunn makes clear, the fact that Plaintiffs' state law claims turn in part on the application of federal laws—the HIPAA, the HITECH Act, the FDCPA, and the federal securities laws—is not enough to satisfy Grable.  Defendants suggest that the federal issues are substantial to the federal system as a whole because resolving Plaintiffs' state law claims will require the state courts to perform "the

analysis and interpretation of dozens of regulatory provisions promulgated under these statutes, most or all of which have never previously been adjudicated."  That may be so, but Gunn answers that argument: the state court's rulings will not bind the federal courts in future cases and will have no preclusive effect beyond the parties to the state litigation, and the possibility that the parties might be subjected to a state court's incorrect interpretation of federal law does not suffice to create "arising under" jurisdiction.  The state court's resolution of those federal issues, in other words, will not have effects beyond the parties to these suits and certainly could not pose a threat to the workings of the federal system as a whole.

Id. (internal citations omitted).  Therefore, although resolution of plaintiff's claims in Haith involved interpretation of three complex federal statutory schemes and federal securities laws and regulations, the court rejected defendant's argument that was sufficient to create a federal question. As in Haith, this Court cannot conclude that interpretation of the FCN Treaty in assessing the anticipated defense of CCE and CCA is sufficient to fit within the "slim category" allowed under Grable.  Empire HealthChoice Assur., Inc., 547 U.S. at 701.  That is particularly true given that, as in Haith, any state court's ruling will not bind the federal courts in future cases regarding the FCN Treaty, and will have no preclusive effect beyond the parties to the state litigation.

Understanding the proper scope of the FCN Treaty is pertinent to Plaintiff's claims. Similarly, borrowing from Gunn, a uniform application of the patent laws is likely just as important, if not more so.  But as in Gunn, the question is not one of general importance.  Almost all claims that implicate federal law are important in some way, but caselaw instructs that they rarely will be sufficiently substantial to invoke federal jurisdiction under Grable.  See, e.g., Empire HealthChoice Assur., Inc. 547 U.S. at 701 ("In sum, Grable emphasized that it takes more than a federal element to open the 'arising under' door."); Illinois v. McGraw-Hill Cos., 2013 U.S. Dist. LEXIS 63315, 12-13 (N.D. Ill. May 2, 2013) ("Moreover, even if the SEC's regulations might in some way influence the analysis of the State's claims, the mere 'influence of federal law on the

outcome of a . . . suit is not enough to support arising-under jurisdiction.'") (quoting <u>Bennett v. Sw. Airlines Co.</u>, 484 F.3d 907, 910 (7th Cir. 2007)); <u>Shore Bank v. Harvard</u>, 2013 U.S. Dist. LEXIS 32556, at *28 (E.D. Va. Mar. 8, 2013) ("The mere presence of some federal issue is not sufficient to support federal jurisdiction."); <u>West Virginia v. CVS Pharmacy, Inc.</u>, 748 F. Supp. 2d 580, 586 (S.D. W. Va. 2010) (remanding and finding no jurisdiction under <u>Grable</u> over state attorney general's consumer protection claim even though the claim might implicate ERISA issues, because the claim "will stand or fall on whether defendants' [conduct is] in accordance with [state law.]"); <u>New York v. Dell, Inc.</u>, 514 F. Supp. 2d 397, 401 (N.D.N.Y. 2007) (remanding and finding no jurisdiction under <u>Grable</u> where state attorney general's "right to relief does not necessarily depend upon federal law" because the "claims are fully actionable under the state laws asserted.").

Every analysis of any federal statute, regulation, or treaty can be considered important as they likely all involve important subject matter. But <u>Gunn</u> requires more than that; there must be some serious consequence to the federal system as a whole. Assessing how substantial or how serious an issue must be to give rise to federal jurisdiction is no easy task, but guided by the "poles" the Supreme Court provided in <u>Gunn</u>, it is apparent that the issue of how to interpret the FCN Treaty under particular facts is not so uniquely important to the federal system as a whole as to fit within the narrow confines of <u>Grable</u>. That question falls far closer to resolving an issue of patent law limited to one case rather than to an issue involving the federal government being able to adjudicate its own administrative decisions such as in <u>Grable</u>, or assessing whether a Congressional act violated the United States Constitution in <u>Smith</u>. Those cases presented substantial issues regarding the federal system. <u>Grable</u> directly implicated the IRS's ability to seize

and sell property, and <u>Smith</u> presented a challenge to the federal government's ability to issue valid bonds. Am erroneous state court holding would have imperiled the federal government's ability to raise revenue, either through the collection of taxes or issuing of bonds. Defendants point to no threat here nearly as significant.

Even assuming that Defendants are correct that the decision could have an effect beyond these particular facts, there are numerous federal court decisions discussing and interpreting FCN treaties in the context of employment-discrimination actions. <u>See</u>, <u>e.g.</u>, <u>Sumitomo Shoji America, Inc. v. Avagliano</u>, 457 U.S. 176, 189 (1982) (holding that a wholly-owned American subsidiary of a Japanese parent company was not protected by the Japanese FCN Treaty); <u>Ventress v. Japan Airlines</u>, 486 F.3d 1111, 1118 (9th Cir. 2007) (finding that FCN treaties allow foreign companies to discriminate in favor of their own nationals, but do not otherwise exempt such companies from relevant local employment laws); <u>Bennett v. Total Minatome Corp.</u>, 138 F.3d 1053, 1059 (5th Cir. 1998) (finding that the French FCN Treaty allowed French companies to discriminate based on citizenship); <u>Fortino v. Quasar Co.</u>, 950 F.2d 389, 391-92 (7th Cir. 1991) (finding that while the Japanese FCN Treaty allows discrimination based on relevant citizenship, it does not allow discrimination on other grounds); <u>see</u> <u>also</u> <u>MacNamara v. Korean Air Lines</u>, 863 F.2d 1135, 1139 (3d Cir. 1988) (examining the Korean FCN Treaty's implications regarding discriminatory hiring and firing practices, and noting that it is identical to the Japanese FCN Treaty); <u>Wickes v. Olympic Airways</u>, 745 F.2d 363, 368 (6th Cir. 1984) (finding that the Greek FCN Treaty allowed only "a narrow privilege to discriminate in favor of Greek citizens"). Two of these cases, <u>Sumitomo</u> and <u>McNamara</u>, are particularly relevant and are discussed by the parties in some detail.

In <u>Sumitomo Shoji America, Inc. v. Avagliano</u>, 457 U.S. 176 (1982), the Supreme Court

19

held that an American subsidiary of a foreign parent was not protected by the Japanese FCN Treaty. The underlying case was brought by female employees of a New York corporation that was a wholly owned subsidiary of a Japanese corporation. <u>Sumitomo</u>, 457 U.S. at 177. The female employees alleged that it was improper for the company to hire only Japanese males for certain positions. Like the defendants in this case, Sumitomo relied on the Japanese FCN Treaty. The Second Circuit Court of Appeals held that the FCN Treaty did not insulate the employer's conduct. The Supreme Court reversed and remanded on the grounds that the FCN Treaty did not apply to a wholly owned subsidiary that was a domestic corporation. <u>Id.</u> at 189.

Defendants argue that the <u>Sumitomo</u> Court did not address whether a subsidiary can enforce such rights if the parent corporation dictated the subsidiary's actions, and therefore that an open question remains regarding the reach of the FCN Treaty's protections. Def. Opp., ECF No. 21, at 16; <u>see</u> <u>Sumitomo</u>, 457 U.S. at 189, n.19. Several federal courts have addressed and answered this question. <u>See</u> <u>Bennett v. Total Minatome Corp.</u>, 138 F.3d 1053, 1059 (5th Cir. 1998); <u>Papaila v. Uniden Am. Corp.</u>, 51 F.3d 54 (5th Cir. 1995); <u>Fortino v. Quasar Co.</u>, 950 F.2d 389 (7th Cir. 1991); <u>Schanfield v. Sojitz Corp. of Am.</u>, 663 F. Supp. 2d 305 (S.D.N.Y. 2009). Defendants argue the merits of whether CCA, a domestic corporation that is a wholly owned subsidiary of a Japanese corporation, can assert the protections of the FCN Treaty. But their argument misses the point of this motion to remand. For the purpose of whether the <u>Grable</u> exception applies to confer federal jurisdiction over purely state-law claims, what is relevant is that there exists a well developed body of federal case law outlining circumstances in which a wholly-owned subsidiary may and may not invoke the protections of the FCN Treaty. Defendants themselves acknowledge that there are "numerous" decisions discussing this matter. Def. Opp.,

ECF No. 21, at 16 (citing four federal cases).  This mirrors <u>Gunn</u>.  In <u>Gunn</u>, as here, there was no substantial federal issue, in part, because well developed federal case law both provided guidance to any state court adjudicating the issue. and provided protection against any state court decision defining the contours of a federal issue.

The Third Circuit's decision in <u>MacNamara v. Korean Air Lines</u>, 863 F.2d 1135 (3d Cir. 1988), is also instructive.  There, the Third Circuit had to decide the relationship between the Korean FCN Treaty, on the one hand, and Title VII and the Age Discrimination in Employment Act, on the other hand.  Plaintiff, a United States citizen, was fired and replaced with a younger Korean citizen.  Defendant argued that even if its practices were discriminatory, they were protected by the FCN Treaty—and relied on a provision of the treaty that is nearly identical to the provision on which Defendants rely here.  <u>Id.</u> at 1137-1138.  The Third Circuit held that issues of discrimination based on age, race, and national origin were distinct from those involving citizenship, and thus allowed plaintiff's lawsuit to proceed.  "There is no logical conflict between Article VIII(1) [of the FCN Treaty], as we have interpreted it, and Title VII or the ADEA insofar as the latter proscribe intentional discrimination on the basis of race, national origin, and age. Contrary to the apparent assumption of the Second Circuit Court of Appeals in <u>Sumitomo</u>, national origin discrimination and citizenship discrimination are distinct phenomena."  <u>Id.</u> at 1146-1147.

Defendants argue that factual distinctions between this matter and <u>McNamara</u> undermine its applicability and compel a different result.  Def. Opp., ECF No. 21, at 13.  In particular, <u>McNamara</u> and similar cases were brought by American citizens, while Plaintiff is allegedly a Japanese citizen.  Def. Opp., ECF No. 21, at 6.  But that is not the issue.  <u>McNamara</u> is controlling federal precedent interpreting the scope of an FCN treaty provision that is nearly identical to the

treaty provision at issue here. That decision has been cited and applied in more than thirty court opinions. While it may be true that resolution of Plaintiff's discrimination claims requires a court to interpret the FCN Treaty's language, Defendants articulate no reason why a state court, guided by well developed federal precedent, cannot do so in this case. Def. Opp., ECF No. 21, at 11. And should a state court reach a decision that does not comport with federal law, although there is no reason to think that will happen, such a ruling will have no effect on federal proceedings or precedent.

Additionally, even assuming that Defendants correctly assert that factual distinctions between precedent and this case present a matter of first impression—although it does not appear true considering the breadth of relevant case law—that does not mean the issue poses so significant an issue to the federal system, as a whole, to confer subject matter jurisdiction. The Supreme Court specifically counseled caution in matters involving potentially novel issues. As discussed above, either the issue will be infrequently raised or will be addressed in due course by a federal court properly asserting subject matter jurisdiction. "If [a novel] question arises frequently, it will soon be resolved within the federal system, laying to rest any contrary state court precedent; if it does not arise frequently, it is unlikely to implicate substantial federal interests." Gunn, 133 S. Ct. at 1067; Haith, 2013 U.S. Dist. LEXIS 28042, at *16 ("These cases, rather, are much like Gunn: right or wrong, the state courts' resolution of the federal issues will not have a substantial effect beyond the parties themselves.").

The case on which Defendants chiefly rely does not address the core issue of the substantiality of the federal issues at play here. Defendants cite Spiess v. C. Itoh & Co. (Am.), Inc., 643 F.2d 353 (5th Cir. 1981), for the proposition that foreign companies, and their

subsidiaries, may freely discriminate in favor of their own citizens for management positions.  Def. Opp., ECF No. 21, at 12 (citing Spiess, 643 F.2d at 361-63).  The court in Spiess never reached the issue of whether the FCN Treaty blocked other forms of discrimination, such as based on age.  Moreover, Spiess predated the Supreme Court's ruling in Sumitomo, where the Court reached the opposite conclusion regarding whether wholly owned subsidiaries are protected under an FCN treaty.  Sumitomo, 457 U.S. 176 (finding that a subsidiary, even if wholly foreign owned, would not fall under the protection of the FCN treaty if it was incorporated domestically).  And, most importantly, Spiess in no way demonstrates that allowing a state court to interpret the issues at bar necessarily would have far reaching, if any, effects upon the federal system as a whole.

Whatever the merits of Defendants' proposed use of the FCN Treaty, the issue is not substantial.  The breadth of federal case law interpreting the same or similar issue provides a state court with rich and fertile ground in which to analyze the issues and render a decision.  Moreover, should any such decision run contrary to federal case law, that decision will not impugn any federal interest as the scope and meaning of the FCN Treaty have been extensively litigated and decided.  See Gunn, 133 S. Ct. at 1067.  Finally, any state court decision that improperly resolves an issue of first impression either will be limited to these facts, or will be resolved in time by federal courts properly exercising their jurisdiction.  Ultimately, Defendants have not met their burden and demonstrated that this issue will have "far reaching effects" on either the FCN or "the federal system in general."  Id.

### iv. The Federal-State Judicial Balance

Because the four-factor test laid out in Gunn is conjunctive, and the Court has already concluded that the third factor weighs against finding federal jurisdiction, the Court need not reach

the fourth issue. Gunn, 133 S. Ct. at 1065 ("Where all four of these requirements are met . . . jurisdiction is proper . . ."). For the sake of completeness, however, the Court will also analyze the fourth prong of Gunn.

Federal courts can, and do, hear state law claims with sufficient regularity and ability. But where, as here, plaintiff's claims are based solely on state law, the domestic defendant is incorporated within the state, the Complaint alleges that at least some of the discriminatory conduct occurred within this state, and no diversity jurisdiction lies, the state has a substantial interest in the case being decided within its judiciary.[6] The Court finds that the state judiciary's interest in ruling upon its own discrimination laws would weigh in favor of denying federal jurisdiction.

Similar to the Court's reasoning in Gunn, which instructed that states have a great interest in defining professional legal standards, states also have an interest in ensuring that companies incorporated within their state comply with applicable discrimination statutes. See Gunn, 133 S. Ct. 1068. Even if such discrimination statutes are preempted or barred by a treaty, as Defendants assert, the state has an interest in defining the bounds and extent to which its employment laws apply.

The Court does not suggest that the parties' interests in this case are less than significant.

_____

[6] It is clear that there is no diversity jurisdiction. Plaintiff is said to be a lawful permanent resident of New Jersey. Pl. Reply, ECF No. 23, at 3. Defendant CCA is a corporation incorporated in New Jersey and thus a citizen of New Jersey for purposes of diversity jurisdiction. 28 U.S.C. § 1332(c)(1). Congress made plain in the 28 U.S.C. § 1332(a)(2) that "the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State." 28 U.S.C. § 1332(a)(2). Thus, the Court cannot have diversity jurisdiction of this matter.

Also, the Court does not opine on whether the FCN Treaty insulates Defendants from liability.  But here the FCN Treaty is being raised as a potential affirmative defense, and the Supreme Court and other federal courts are clear that federal-question jurisdiction cannot arise from an affirmative defense that implicates federal law.  Nothing in <u>Gunn</u> or <u>Grable</u> changes that analysis.  Nor does this implication of federal law in this case pose a sufficiently substantial issue.  The instances in which a federal court can exercise federal question jurisdiction, other than plaintiff setting forth a federal cause of action, are "extremely rare."  <u>Gunn</u>, 133 S. Ct. at 1064 (stating that this exception to the well-pleaded complaint rule represents a "special and small category" of cases).  Even if there were some doubt as to the importance of the FCN Treaty to the federal system or the federal-state judicial balance, it is Defendants' burden to prove jurisdiction and § 1441 must be construed strictly and "all doubts must be resolved in favor of remand."  <u>See</u> <u>Samuel-Bassett</u>, 357 F.3d at 403.  Defendants have not met their burden of showing that the Court possesses federal subject-matter jurisdiction.

**IV.    CONCLUSION**

For the reasons above, the Undersigned respectfully recommends that the Court grant Plaintiffs' motion to remand and remand this matter to the Superior Court of New Jersey, Passaic County.

The parties have fourteen days to file and serve objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 and L. Civ. R. 71.1(c)(2).

Date: May 10, 2013                                    *s/Michael A. Hammer*
                                                       UNITED STATED MAGISTRATE JUDGE